**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

DAVID JOSEPH ANNARELLI,     )
     Petitioner,     )
     )     Civil Action No. 7:20-cv-00025
v.     )
     )     By:  Elizabeth K. Dillon
HAROLD W. CLARKE, DIRECTOR,     )     United States District Judge
     Respondent.     )

**MEMORANDUM OPINION**

Petitioner David Joseph Annarelli, a Virginia inmate, has filed, through counsel, an

original petition for writ of habeas corpus, pursuant to 28 U.S.C.§ 2254.  Annarelli challenges his

incarceration under a Floyd County Circuit Court criminal judgment for malicious wounding of a

law enforcement officer in violation of Virginia Code § 18.2-51.1.  In 2017, the court sentenced

Annarelli to twenty years in prison with five years suspended.  (Cir. Ct. R., hereafter CCR, at

119–120.)  Respondent has filed a motion to dismiss the petition, arguing that the Virginia

habeas court's decision is neither contrary to nor an unreasonable application of federal law, nor

does the decision involve an unreasonable determination of facts.  After careful review of

Annarelli's claims and the entire record, the court will grant the motion to dismiss, deny

Annarelli's petition, and decline to issue a certificate of appealability.

I.  BACKGROUND

The facts of the underlying case are not in dispute and were stipulated at Annarelli's plea

hearing on May 2, 2017.  (Plea Hr'g Tr., May 2, 2017, pp. 11–32.)  The Floyd County Sheriff's

Office received a 911 call around 8:30 p.m. on September 24, 2016, stating that Annarelli was

highly intoxicated and had assaulted his son and wife at their home in Floyd County.  Officers

were dispatched to the address, but before they arrived, the Sheriff's Office received another call,

advising that Annarelli's son, wife, and mother were leaving the premises to stay elsewhere, but that Annarelli remained at the back of the residence, very intoxicated. (*Id.* at 11–12.)

At 8:47 p.m., Deputies Akers and Bohnke pulled into the driveway of Annarelli's home, without their emergency lights on, but with the car lights on. Seeing no lights or activity in the front of the house, they split up, one deputy going to the left of the house and the other going to the right. As they reached the back of the house, they saw a deck off the back door, but no other activity. The deputies mounted the stairs onto the deck, approached the open back door, and called into the house saying, "Hello, Sheriff's Office." (*Id.* at 14.) A distant voice, which appeared to be coming from upstairs, was yelling at them. After announcing and identifying themselves two more times, they heard the following response: "If you come into my house, I will shoot you." (*Id.*)

At that point, both officers unholstered their service pistols and continued to call for the person inside. Deputy Bohnke surveyed the inside with his flashlight. There appeared to be a great deal of damage done in the kitchen area, which was just inside the back porch, with tables overturned and items scattered around on the floor. Deputy Akers said, "This is Deputy Akers with the Floyd County Sheriff's Office; I need to talk to you." (*Id.* at 15.) They heard a male voice yell, "Get out of my f***ing house, you're trespassing; you don't have a right to be here." (*Id.*) They responded that they were there to investigate a call they received about a domestic dispute and to make sure that everything was all right. The voice responded that he was a tax-paying citizen, that he pays the salary of the officers, and that he has rights as a citizen. The deputies continued to try to speak with him, yelling back and forth through the open doorway. (*Id.*)

The voice finally yelled that he wanted proof that they were the police; he was not

coming down from upstairs because of all the cop killings of citizens reported in the news. Deputy Akers again said that they were deputies with the Sheriff's Office and explained why they were there. The voice continued yelling belligerently, insulting the officers, and refusing to come down. Then, he said that he was loading his weapon, and he gave the deputies to the count of ten to get out of his house or he would come down to start shooting. (*Id.* at 15–16.)

Both officers stepped back from the door, and Deputy Bohnke radioed to dispatch that the suspect threatened use of a weapon. The deputies then retreated off the deck and into the yard behind the house. They eventually took position a few yards behind a couple of tree stumps and to the right of the steps. (*Id.*)

Deputy Coleman, the patrol supervisor, advised that he was responding to the scene and that Investigator Stanley would also be asked to respond. Both Deputy Coleman and Investigator Stanley were off duty but lived in the vicinity of Annarelli's residence. At 8:55 p.m., Investigator Stanley noted that he was in route. Meanwhile, dispatch called the individual that had placed the original two phone calls to 911 to confirm whether there were guns in the house. They confirmed that a rifle and a shotgun were in the home. (*Id.* at 16–17.)

A male, later identified as Annarelli, then came out onto the back deck, at which time the officers saw what appeared to be a long gun in his hands. He was yelling that he had either a 10-gauge shotgun or a 10-millimeter shotgun. Both officers radioed confirmation that they saw a gun of some sort in his hand. The lighting was poor, with the only light coming from inside the kitchen area. There was no backyard or back porch light on. The man called for the deputies to identify themselves, asking them to show badges and ID cards. He asked the deputies to put their weapons away and to come up onto the porch with their identification. Deputy Bohnke responded that they could not do that while Annarelli was holding a weapon. The man again

yelled that he needed to see their ID.  Deputy Bohnke responded that they were in uniform, with their badges on their uniforms, and again asked him to put the gun down.  The man put the gun down and leaned it up against the house, but he was standing close to the weapon.  (*Id.* at 18.)

While that exchange was going on between Akers, Bohnke, and Annarelli, Investigator Stanley had arrived on scene and started to make his way around the right side of the house to see what was going on in the back.  He observed the two deputies in the back yard and a man standing on the deck; he then went back to the front and consulted briefly with Deputy Akers on the radio, to ask her if she and Bohnke thought that Stanley could come in through the front door and get the man under control.  Deputy Stanley went to his vehicle, put away his service rifle, and retrieved a taser instead, opting for a less lethal method to get the suspect under control. Stanley planned to enter through the front of the home and confirmed this with Deputy Coleman, the patrol supervisor who was still in route.  Deputy Coleman told Stanley to wait until Deputy Coleman arrived, so long as the situation was stable.  (*Id.* at 19.)

After Annarelli put his gun down and leaned it against the house, Deputy Bohnke asked him to step away from the gun.  Annarelli then got angry, picked up the shotgun saying "f*** it," and aimed at the deputies in the backyard.  (*Id.* at 20.)  Deputy Akers radioed dispatch to advise that the suspect was pointing the gun at them.  Hearing that, Investigator Stanley, who was waiting outside the front door, drew his service pistol, kicked in the door, and entered the darkened home.  He was wearing a bullet-proof vest with "SHERIFF" on the front in large white letters.  The deputies in the backyard saw Annarelli pivot, and then shots were fired back and forth inside the house.  (*Id.*)

The forensic investigation revealed that approximately four shots were fired from a 20-gauge semi-automatic shotgun.  Investigator Stanley estimated that he shot eight to ten rounds

from his pistol.  The trajectories indicated that Annarelli was retreating, possibly bending down and moving backwards during the final shots from his shotgun.  The first shotgun blast is the one that struck Deputy Stanley, as he entered the living room.  Although Deputy Stanley was wearing a bullet-proof vest, the shotgun pellets struck the weak points of the vest, in the webbing or Velcro where the front joins with the back.  Deputy Stanley suffered injuries to his left torso and right leg.  (*Id.* at 22–25.)

After the shooting, Annarelli retreated onto the back porch with his hands up in the air and sat down, saying, "Don't shoot, don't shoot."  Deputy Bohnke and Deputy Akers ran from the backyard onto the deck; Annarelli was saying, "I didn't mean to" and started crying as he was taken into custody at 9:06 p.m.  Deputy Bohnke noted that Annarelli seemed to be "on an emotional rollercoaster with one minute he would be crying and the next he would be hostile or antagonistic." (PSR, p. 2 (4 of 8), CCR at 107.)  Before Annarelli was moved to Deputy Akers' police car, he was searched for additional weapons.  Five shotgun shells were found in his right pants pocket.  The shotgun shells in his pocket and those that he had fired appeared to be #3 buckshot.  (Plea Hr'g Tr. at 24–26.)

Deputy Bohnke went to check on the condition of Investigator Stanley, as did Deputy Coleman, who had just arrived on scene.  Medical attention was then obtained for Investigator Stanley, who was taken by helicopter to Roanoke Carilion Memorial Hospital.  Fortunately, most of his injuries were relatively minor, but some of the pellets went through his left side and lodged in the soft tissues of his back.  He had to have follow-up surgery to have one pellet removed, and another pellet remains lodged in his side.  He also suffered a wound in his leg and bruises under the bullet-proof vest, where the vest had been struck by other pellets.  (*Id.* at 26–27.)

Emergency medical personnel examined Annarelli at the scene for trouble breathing, and

he made the following statement to the paramedic: "I got into a fight with my sixteen-year-old; they left, next thing I know people in the house were yelling at me, I went down with my coyote shotgun, suddenly there were flashlights on every side of the house, the door got kicked in and my finger went off." (*Id.* at 28.)  Sometime later, around 3:00 or 4:00 in the morning, Annarelli was taken before the magistrate and formally charged with malicious wounding of a law enforcement officer and use of a firearm in that offense.  Although Annarelli declined to speak with the officers, he told the magistrate that he knew the police were outside, and he took full responsibility for his actions.  He said it was an accident and he didn't mean to do it.  There were people on the side of his house and in the backyard, when someone kicked in the front door and the gun just went off.  He dropped the gun right away and heard five or six rounds whiz by his head after he shot.  (*Id.*)

Because Annarelli told his lawyer that he did not remember the events of the evening, his lawyer requested a psychological evaluation for sanity at the time of the offense and competency to stand trial, which was conducted at Central State Hospital.  The report prepared by the evaluators at Central State found Annarelli competent to stand trial.  (CCR at 42–48.)  The evaluators spoke to Annarelli and to his common law wife, Ms. McAllister, about his background, but did not speak to his parents or his son.  Annarelli told the evaluators that he had an "awesome" childhood.  Annarelli disclosed treatment in his teens for suspected ADHD, special education classes for emotional issues, and a traumatic brain injury in 2011.  The report made no mention of any diagnostic tests performed to identify either brain damage or psychological impairment, nor of any review of prior medical records or school records, despite the information provided.  The evaluators noted an intake diagnosis of alcohol abuse disorder and cannabis abuse disorder.

The Commonwealth doubted the claimed memory loss, and the state police examined the telephone calls Annarelli made from the jail for the first month or so after his arrest.  In those calls, Annarelli said that he didn't remember, or didn't really remember, what had happened.  At the same time, in a couple of the early calls, he talked about some details.  For example, on September 28, four days after the shooting, he said he heard a loud boom from the front of the house, jumped, and the trigger went off, when he wasn't even looking in that direction.  On September 29, he said that the deputies were talking outside, but he couldn't hear their words; then, there was a loud bang at the front door, and he twitched so hard the gun went off.  (*Id.* at 29.)  In addition to those phone calls, the Commonwealth planned to rely on statements Annarelli allegedly made to William Lewis, a convicted sex offender incarcerated at the New River Valley Regional Jail with Annarelli.  Lewis claimed that Annarelli said he had been tearing up the house; he was angry, and he'd had a fight with his family.  When he saw the police coming up to his house, he grabbed his shotgun.  He said again that he saw them coming and knew they were police, and he had decided he was not going to answer the door.  He was not sure whether he had birdshot or buckshot in the shotgun.  Later, he told Lewis that he knew they were cops because they announced themselves when they were at the bell.  Annarelli allegedly further described to Lewis the officers' movement from the front to the back of the house.  (*Id.* at 29–32.)

Because of the above events, Annarelli was ultimately indicted for malicious wounding of a law enforcement officer, use of a firearm in the malicious wounding of an officer, aggravated malicious wounding, and two counts of assault and battery of law enforcement officers.  (CCR at 1–5.)  Pursuant to a plea agreement, Annarelli pled "no contest" to malicious wounding of a law enforcement officer, and the remaining charges were nolle prossed.  (Plea Hr'g Tr. at 6–7.)  The parties had no agreement on sentencing.

Prior to sentencing, probation officer Audrey Jones prepared a presentence report (PSR), copies of which were provided to both attorneys and to the court by letter of August 1, 2017. Although Annarelli denied that he had been diagnosed with any mental health conditions, he acknowledged that he believed he began suffering issues in 2016, following the acquaintance rape of his common law wife, the death of his maternal aunt, and his son's threatened suicide. He also acknowledged a traumatic brain injury in 2011.  His wife, Ms. McAllister, provided further information, including that Annarelli had suffered an intracranial bleed after jumping out the passenger door of a moving vehicle and left the hospital against medical advice.  (PSR, Mental Health Information Narrative.)

P.O. Jones also spoke with Annarelli's mother, who painted a very different picture of Annarelli's mental health history.  Adopted at 11 days old, Annarelli was diagnosed as an "emotionally disturbed child" at a young age.  In public school, he attended special education classes because of his difficulties.  From fourth grade to eighth grade, he attended Devereux Advanced Behavioral Health school.  In his teens, he was committed for mental health evaluation, but escaped from the facility after two weeks.  He was treated at Belmont Behavioral Facility in Philadelphia and at Northeast Psychiatric in Philadelphia.  After Annarelli was an adult, on two occasions, she had requested a wellness check from law enforcement because of emails he sent her when he was "depressed and drinking a lot." (*Id.*)

Notwithstanding his mental health issues, Annarelli obtained a GED after he left high school.  He played music in a band and held employment in restaurants and as a glassblower.  He had been with his common law wife for 14 years, and he was raising his son from an earlier relationship.  His family had lived at their home in Floyd County for almost five years.  Other

than some traffic infractions and a 1993 misdemeanor marijuana possession conviction in New Jersey, Annarelli had no prior record.  (PSR.)

At the sentencing hearing on August 15, 2017, the Commonwealth introduced the testimony of Investigator Stanley and his wife about the impact of the shooting, particularly on their emotional functioning.  The court also considered a victim impact statement from the Sheriff of Floyd County, indicating that the entire law enforcement community had suffered as a result of Annarelli's actions.  Probation Officer Jones testified about preparation of the PSR and offered sentencing guideline calculations under Virginia's advisory sentencing guidelines, which recommended a sentence between 1 year, 8 months and 4 years, 8 months, with a midpoint of 3 years, 2 months.[1]  (Sent. Hr'g Tr., Aug. 15, 2017, at 10.)

Defense counsel called several family members and friends to testify on behalf of Annarelli.  First, Dr. Ralph Brown, a friend who played in a band with Annarelli, testified about his observations of Annarelli over the one year they played together in the band before the offense resulting in Annarelli's arrest.  Dr. Brown was and is a staff physician at New River Valley Medical Center, with advanced certification in physical rehabilitation medicine, including traumatic brain injury.  He has treated many patients with traumatic brain injury over his years in practice, and based on his experience, he thought Annarelli displayed behavior patterns consistent with brain injury patients, including impulsive behavior, agitation, sleep disturbances, and mood disorder.  Dr. Brown never personally evaluated Annarelli at any time before testifying in court, but after Annarelli was arrested, Dr. Brown reviewed the medical records from the 2011 injury at the request of Annarelli's wife.  The 2011 MRI exam revealed that Annarelli suffered internal bleeding on both sides of his brain in an injury pattern that would

---

[1] The offense of conviction had a sentencing range of 5 to 30 years, with a mandatory, non-suspendable minimum of two years.  Va. Code § 18.2-51.1.

9

likely have been fatal to approximately 50% of people who sustained such an injury.  Because the bleeding was visible on the MRI, the injury would be categorized as an extremely severe brain injury.  Immediately following the accident in 2011, Annarelli exhibited disoriented behavior; he was also nauseous and complained of severe headaches, for which he sought emergency room treatment on several occasions.  Finally, he had no day-to-day memory for some months after the accident.  In Dr. Brown's opinion, Annarelli needed treatment for his brain injury, and his condition could be improved.  Dr. Brown was willing to accept Annarelli as a patient for this treatment.  (*Id.* at 31–36.)

On cross examination, Dr. Brown acknowledged that he had never performed a clinical examination of Annarelli and conceded that without a full medical history and clinical exam, he could not rule out other possible causes for Annarelli's behavior.  He did express the opinion that Annarelli, "more likely than not . . . would get better, at least . . . with treatment."  (*Id.* at 38.)

Annarelli's family members—his father, mother, common law wife, and brother—each testified that Annarelli had always been respectful, kind, helpful, affectionate, and generous.  His mother even described him as "generous to a fault," feeding people in his home when he could barely afford to buy groceries for himself.  (*Id.* at 48.)  She also noted that Annarelli was a good father to his son, Ashwyn, but equally so to Ashwyn's younger half-brother, who was no biological relationship to Annarelli.  Annarelli's younger brother said Annarelli was generous with his time and a good conversationalist, even though the two of them were very different.

 All noted a change in Annarelli's behavior after the accident in 2011.  His father said Annarelli became more talkative and started rambling a lot and became more impulsive and energetic.  His mother said he had always been "complicated," following his own drummer, and that he had ADHD as a child and teen.  Anna Marie McAllister, Annarelli's partner for 14 years,

also described increased impulsivity after the accident, which led them to leave North Carolina and move to Virginia.  They stayed with friends for a while, and then with the help of Annarelli's parents, bought their home in Floyd, where they had lived since 2012.

McAllister also testified that Annarelli suffered a series of stressful events between January and March 2016 that left him withdrawn and depressed:  the death of his mother's sister from breast cancer hit him very hard; his son Ashwyn became suicidal after breakup with his first girlfriend; and a friend of the family raped McAllister in March 2016, which had created much tension in her relationship with Annarelli.  She acknowledged that Annarelli's violent behavior on September 24, 2016, had frightened her and Ashwyn a great deal, but he had never acted that way before; she considered him a good person who deserved a chance.  (*Id.* at 41–60.)

Five friends who had known Annarelli for 18 to 23 years also testified, describing him as a very kind person above all else.  Jason Adkins testified that he was initially put off by Annarelli's "unique personality," but grew to appreciate him over time, especially after the birth of Annarelli's son.  Adkins described Annarelli as someone who really "stepped up to the plate" to be an excellent father to his son and a devoted family man.  (*Id.* at 62–63.)  Matthew Watts considered Annarelli like a big brother.  Watts was still a teen when he met Annarelli, but Annarelli was kind and treated him with respect; Watts credits Annarelli with steering him away from a darker path that he had been heading down before Annarelli befriended him.  (*Id.* at 72–73.)  Samuel Aiken met Annarelli in the late 1990s, when Annarelli was a regular customer at Aiken's restaurant.  He described Annarelli as kind, caring, smart, and honest, as well as musically talented.  Aiken closed his restaurant six or seven years later and did not see Annarelli again until 2012, when Annarelli had moved to Floyd.  He continued to view Annarelli as

someone who cared about people a great deal and went out of his way to help them.  (*Id.* at 77–79.)

Two of the friends had noticed changes in Annarelli after 2011; Watts, who had moved away from the area, said Annarelli seemed "unsettled" when Watts came to visit him in Virginia. (*Id.* at 75.)  Jeremiah Cook saw a change in Annarelli's behavior, demeanor, and outlook, and saw him struggle with memory issues after the head injury.  ((*Id.* at 67.)

Without fail, his friends described being surprised by Annarelli's actions on September 24, 2016.  Cook said, "it did not sound like him."  (*Id.* at 66.)  Watts said he was "shocked."  (*Id.* at 74.)  Aiken said he was "blown away" when he heard what had happened.  (*Id.* at 79.)  Jay Malone, who also considered Annarelli like a brother, expressed "disbelief" that anything would have led Annarelli to do something like this.  (*Id.* at 69.)

Finally, Annarelli testified on his own behalf at sentencing.  He first stated that he was deeply sorry for the pain he had caused Investigator Stanley and his family.  He also said he had a hard time reconciling what had happened with how he had always perceived himself, as a non-violent person, and described being in a state of cognitive dissonance, being non-violent, yet knowing that he did this, even though he does not remember it.  When questioning Annarelli about his lack of memory on cross, the prosecutor played a recording of a phone call between Annarelli and his mother, five days after the incident, in which Annarelli described the event similar to the way he had described it to the magistrate.  Annarelli acknowledged that the recording was his voice and his mother's, but said he had no memory of the conversation; further, he had no memory of speaking to the paramedics or the magistrate the night of the events.  He could not explain why he seemed to remember things in that phone conversation that he did not remember now.  The only information he had about that night at the time of the

sentencing hearing came from what his wife and his lawyer told him.  Annarelli denied talking to
Lewis about his case, although they talked about other things, including repairs Annarelli had
made to the house himself, the guns he owned, and his feelings about his wife getting raped.  (*Id.*
at 80–105.)

The judge had several questions for Annarelli after the prosecutor finished cross
examining him:

> JUDGE LONG:  Sir, I have several questions for you.  You have
> no recollection of that evening; is that correct?
>
> THE WITNESS:  I really don't.  I really don't.
>
> JUDGE LONG:  Have you read the presentence report?
>
> THE WITNESS:  I have.  Well Mr. Sobey went over it with me, I
> didn't actually read it.  But he did—
>
> * * * *
>
> JUDGE LONG:  Okay.  So you have no basis for disagreeing with
> anything in that presentence report; do you?
>
> THE WITNESS:  I don't think so.
>
> JUDGE LONG:  Because you have no memory.
>
> THE WITNESS:  Right.
>
> JUDGE LONG:  And do you know that you shot a deputy?
>
> THE WITNESS:  Yes.
>
> JUDGE LONG:  And that's not accidental.
>
> THE WITNESS:  I was, I was told so.
>
> JUDGE LONG:  You were told so what?
>
> THE WITNESS:  That, that, I was told that I shot a police officer.

13

JUDGE LONG:  Was that by accident or did you aim, aim the gun at him and shoot?

THE WITNESS:  I, I don't remember, sir.

JUDGE LONG:  Okay.

THE WITNESS:  I don't remember.

JUDGE LONG:  You shot a deputy—

THE WITNESS:  I do know that—

JUDGE LONG:  —you shot other shots that night; is that correct?

THE WITNESS:  That's what the sentence report says but I don't remember.

JUDGE LONG:  But you can't disagree with it either; can you?

THE WITNESS:  No, I cannot.  That when, that was one of the main reasons why I requested a no contest versus guilty or not guilty.

* * * *

JUDGE LONG:  And no contest is tantamount to a guilty plea; isn't it?

THE WITNESS:  Yes, it is, sir.  And I was made fully aware of that when I accepted the plea.

JUDGE LONG:  And you accepted it.

THE WITNESS:  Yes; I did, sir.

JUDGE LONG:  You've had all these people come in and say what a great person you are.  What's wrong with this picture?  That you are such a great person and you would shoot a deputy.  Tell me what's wrong with that.

THE WITNESS:  Something went terribly wrong.

JUDGE LONG:  What?

THE WITNESS:  I folded under pressure, had some kind—

14

JUDGE LONG:  Folded under pressure?

THE WITNESS:  —had some kind of psychological breakdown.

JUDGE LONG:  But you have no evidence of that in this court today; do you?

THE WITNESS:  No; I don't, sir.  If I had—

JUDGE LONG:  Whatever this doctor said, I'm not sure what he said or didn't say—

THE WITNESS:  If I had some kind of legitimate answer, I would give it to you.  Because I would like to know myself, sir.  I do not harm people.  I have a nonviolent history.

JUDGE LONG:  But you did harm someone.

THE WITNESS:  Yes, I did.

JUDGE LONG:  To the worst extent, you shot them.

THE WITNESS:  Yeah, and I don't know how I'm going to learn to live with that.  I really don't.  I have to look myself in the mirror every day and accept the fact that I caused harm to somebody, which is completely contrary to the kind of person I am.  And I don't know how to live with that.

(*Id.* at 106–110.)

In closing argument, Annarelli's attorney asked for justice tempered with mercy, because the person who committed the crime was not the "real" David Annarelli.  For reasons he [counsel] could not explain and "nobody here can explain," Annarelli's behavior on September 24, 2016, was completely out of character.  Counsel repeatedly described Annarelli's behavior as inexplicable.  (*Id.* at 118–125.)  On rebuttal, the Commonwealth attorney argued that "we can explain it and the answer is all too mundane.  He was angry. . . He was angry that day and anger and frustration combined with alcohol . . ."  (*Id.* at 126.)

Before pronouncing sentence, the court stated:

15

> He put this whole thing in motion when he decided to get angry over whatever was going on, he drank heavily voluntarily, and has no memory of anything.  Now whether that memory is convenient, . . . I think, it's hard to say whether it's convenient or not. . .  *And there's absolutely no credible evidence that a brain injury or mental illness caused him to do that.*  It's all pure speculation.
>
> * * * *
>
> And he, based on everything I've heard, is an extreme danger to the public.  How do we know when this might happen again?  You say in 2011 he fell out of the car, and all of a sudden now that's the crutch he wants to use to not know what he was doing.  There's no evidence of that.

*Id.* at 129, 131 (emphasis added).  The court then imposed a sentence of 20 years, with five years suspended for five years of probation.  Along with the sentence order signed on August 22, 2017, the court completed a final disposition form for the Virginia Criminal Sentencing Commission, explaining the reasons for his significant (321%) departure above the guidelines.[2]  The judge wrote: "1) heinous nature of defendant's action 2) defendant not credible."  (CCR at 111.)

Annarelli appealed the judgment to the Court of Appeals of Virginia, alleging that the trial court improperly considered certain factors and failed to consider relevant factors in setting the sentence and alleging that the trial court erred in imposing an excessive sentence.  On March 13, 2018, the Court of Appeals issued a per curiam opinion denying the petition.  (Va. Ct. App. R., hereafter, VCAR, at 43–45.)  On request for review by a three-judge panel, the court again denied the petition on June 28, 2018.  *Id.* at 51.  Annarelli did not further appeal the case.

Annarelli filed a petition for habeas corpus in the Supreme Court of Virginia on June 6, 2019, alleging that trial counsel provided ineffective assistance of counsel by failing to properly investigate, prepare, and present evidence of Annarelli's longstanding history of mental illness;

---

[2] The trial judge has broad discretion regarding the length of a sentence if it does not exceed the statutory maximum. *Fazilli v. Commonwealth*, 71 Va. App. 239, 248, 835 S.E.2d 87, 92 (2019).

failing to properly investigate, develop, and present evidence of Annarelli's impaired mental state at the time of the offense; and failing to properly investigate, develop, and present evidence of Annarelli's impaired memory, all of which resulted in prejudice to the defense, because there is a reasonable probability that proper presentation of the evidence, including the necessary expert testimony to explain its significance, would have resulted in a lower sentence. Habeas R. at 1–30.

In denying the habeas claim, the Supreme Court of Virginia held that counsel's performance was not deficient in failing to investigate Annarelli's mental health history and impaired mental state at the time of the crime because counsel reasonably relied upon Annarelli's representation that he had never been diagnosed with a mental illness and upon the competency and sanity evaluation performed at Central State Hospital. The court further found that counsel was not deficient in failing to develop evidence supporting Annarelli's impaired memory because counsel could reasonably have decided, based upon the Commonwealth's evidence of Annarelli's statements to the magistrate, phone calls with his mother, and alleged statements to a jailhouse informant, that there was no basis for investigating the alleged memory loss. Finally, the court found no prejudice from counsel's failure to investigate and develop evidence regarding Annarelli's impaired memory because the opinions of Annarelli's expert, Dr. Brown, regarding Annarelli's memory loss, were not expressed to a reasonable degree of medical certainty. *Id.* at 540–546.

In the current and timely § 2254 petition filed in this court, Annarelli raises the same issues he raised in his state habeas petition:

(1) Ineffective assistance of counsel in failing to investigate, prepare, and present evidence of Annarelli's longstanding, serious mental illness;

(2) Ineffective assistance of counsel in in failing to investigate, develop, and present evidence of Annarelli's impaired mental state at the time of the offense; and

(3) Ineffective assistance of counsel in failing to investigate, develop, and present evidence of Annarelli's impaired memory of the offense.

Annarelli argues that he was prejudiced by counsel's ineffective performance in each of the above areas, and that the state habeas decision finding no deficient performance and no prejudice was an unreasonable determination of the facts and law.

## II.  DISCUSSION

### A.  Antiterrorism and Effective Death Penalty Act (AEDPA)

A federal habeas court may grant relief only if a state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  Further, factual findings of the state court "shall be presumed to be correct," with the petitioner having "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

A decision is contrary to federal law only if it reaches a legal conclusion that is directly opposite to a Supreme Court decision or if it reaches the opposite result from the Supreme Court on facts that are materially indistinguishable from the Supreme Court case's facts.  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  A state's decision is an "unreasonable application" of federal law only if the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  *Harrington v. Richter,* 562 U.S. 86, 103 (2011).  The question is not whether a

federal court believes the state court's decision is incorrect, but whether the decision was unreasonable, which is "a substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007). Likewise, the federal court must find more than just an incorrect determination of facts, as "unreasonable determination of the facts" is "a substantially higher threshold." *Id.*

## B. Ineffective Assistance of Counsel

When reviewing counsel's performance on a claim of ineffective assistance, courts apply a highly deferential standard. A petitioner must show that (1) counsel's performance was so deficient that he was not functioning as counsel guaranteed by the Sixth Amendment *and* (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Petitioner must meet both prongs of the test.

Deficient performance requires a showing that counsel's performance fell below "an objective standard of reasonableness . . . under prevailing professional norms." *Id.* at 688. The reviewing court must not rely upon "the distorting effects of hindsight," but must presume that counsel's decisions and actions fell within the wide range of reasonable strategy decisions. *Id*. at 689–90. Under *Strickland*, a reviewing court strongly presumes that counsel rendered adequate decisions and that all significant decisions were made in the exercise of reasonable judgment. 466 U.S. at 690. The *Strickland* standard is "doubly deferential" in the context of a habeas petition, because the deferential standard of review required by § 2254 overlaps with the deferential standard under *Strickland*. *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). In other words, federal courts on habeas review are to give the benefit of the doubt to both the state court and the defense attorney. *Woods*, 136 S. Ct. at 1151.

Thus, the question is not whether "a federal court believes the state court's determination under the *Strickland* standard was incorrect, but whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirazayance*, 556 U.S. 111, 123 (2009). "This double-deference standard effectively cabins our review to determining whether there is *any reasonable argument* that counsel satisfied *Strickland*'s deferential standard." *Owens v. Stirling*, 967 F.3d 396, 412 (4th Cir. 2020) (emphasis added). "If this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 103. "Section 2254(d) codifies the view that habeas corpus is 'a guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Valentino v. Clarke*, 972 F.3d 560, 581 (4th Cir. 2020) (quoting *Harrington*, 562 U.S. at 102–03). Thus, "surmounting *Strickland*'s high bar is never an easy task" but "establishing that a state court's application of *Strickland* under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105.

To establish prejudice under *Strickland*, Annarelli must show that there was "a reasonable probability that the outcome of the proceedings would have been different," which means "a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. When the state court does not address prejudice,[3] this court assesses the issue *de novo*. *Porter v. McCollum*, 558 U.S. 30, 39 (2009).

## C. Counsel's Failure to Investigate, Prepare, and Present Evidence of Annarelli's Longstanding, Serious Mental Illness

The state habeas court found that counsel did not perform deficiently by failing to further investigate and present evidence of mental illness because he reasonably relied upon the competency and sanity evaluation performed at Central State Hospital and Annarelli's denial of

---

[3] The state habeas court did not discuss prejudice in relation to Annarelli's first and second arguments but did find a lack of prejudice with respect to the third argument.

mental illness history.  Annarelli counters that counsel should have done more to pursue

evidence of mitigation.  The state habeas court appeared to rely on the Central State Hospital

report's statements that Annarelli "did not display any acute symptoms of anxiety, depression,

mania, or psychosis" and his mental state was "within normal limits."  Habeas R. at 542.

Annarelli notes, however, that there were no evaluations reported or tests performed to assess his

personality, performance level, or other indicators that would be useful in identifying mitigating

mental health issues that did not reach the level of obvious psychosis or legal insanity.  While the

court appreciates, in hindsight, that counsel may have done more, or pursued a different strategy,

it was not unreasonable for counsel to rely on a recent mental health assessment.  Moreover, the

state court presents a reasonable argument that foregoing neuropsychological testing in reliance

on the Central State Hospital report—a report stating that Annarelli "displayed no symptoms of

mental illness" and "denied any history of mental illness"—satisfies the deferential standard for

deficient performance.  *Id.*

Ananarelli insists that counsel's failure to (1) pursue school records and prior psychiatric

records, (2) interview Annarelli's mother, son, and wife, (3) consult with an appropriate expert to

evaluate the school and psychiatric records and information provided by the family, and (4) learn

of Annarelli's bipolar disorder and how that disorder contributed to cause the crime all

constituted deficient performance.  The court rejects the contention that counsel ignored this

information.  Instead, the record reflects, for example, that numerous friends and family

members testified on behalf of Annarelli at the sentencing hearing.  They discussed various

traumatic events in Annarelli's past and how that impacted his mental state.  Counsel also called

to the stand a doctor and friend, Dr. Brown, to talk about his mental health diagnosis.

Information pertaining to Annarelli's mental health background was also included in the

presence report.  Mitigating evidence was presented to the court in a variety of ways, demonstrating not only that counsel did not render ineffective assistance, but also that Annarelli was not prejudiced by the alleged failure to "do more" or take a different strategic angle.

In sum, the sentencing transcript reflects that trial counsel's strategy was to focus on the fact that Annarelli's violent acts were a drastic departure from his kind and gentle personality. To that end, counsel called several witnesses to testify about Annarelli's long-standing favorable attributes.  Introducing evidence of severe mental illness as a child or bipolar disorder as an adult, which had not been diagnosed, would not necessarily have enhanced that strategy.

For these reasons, the state court's resolution of this claim was not contrary to, or an unreasonable application of, the *Strickland* deficient performance standard.  The court also finds that Annarelli was not prejudiced by counsel's performance.

## D. Counsel's Failure to Investigate, Develop, and Present Evidence of Annarelli's Mental State at the Time of the Offense

The state court rejected this argument for much the same reason as the first argument. The court cited Annarelli's competency evaluation, which "provided no indication petitioner suffered from a serious mental illness which caused or contributed to his behavior," and Annarelli's sanity evaluation, which "also found petitioner had no mental disease or defect at the time of the crime."  Dkt. No. 1-6 at 5.  The court found it reasonable for counsel to rely on these findings.  Further, the court again noted that Annarelli repeatedly denied he had any history of serious mental illness.  Thus, counsel was not deficient for failing to investigate the interaction between Annarelli's brain injury and mental illnesses Annarelli failed to disclose.  The state court's resolution of this claim was not contrary to, or an unreasonable application of, the *Strickland* deficient performance standard.

**E.  Counsel's Failure to Investigate, Develop, and Present Evidence of Annarelli's Impaired Memory of the Offense**

The state habeas court found that Annarelli failed to show either deficient performance or prejudice on this claim.  In finding no deficient performance, the state court held that counsel "could reasonably have determined there was no basis to investigate or develop evidence regarding petitioner's alleged memory loss" because Annarelli gave a statement to the magistrate a few hours after the crime taking responsibility for his actions, and on a phone call from jail with his mother, five days after the crime, "he was able to recall portions of the events."  (Habeas R. at 546.)  Additionally, counsel was advised by the state that an inmate incarcerated with Annarelli would testify that Annarelli told him about the crime.  The court further held that there was no prejudice because the alleged basis for Annarelli's memory loss was "pure speculation," as Dr. Brown[4] did not provide opinions about memory loss to a reasonable degree of medical certainty.[5]  *Id.*

---

[4]  Dr. Bender, who examined Annarelli post-sentencing, also appears to speculate regarding causes of possible memory loss.  He notes that a concussion after Annarelli was punched by his son "could account" for alleged memory loss.  (Bender Report, Dkt. No. 1-2 at 12.)  He further states that severe emotional distress can lead to amnesia.  (*Id.*)  Finally, he states that it is his opinion that the claim of amnesia is credible.  (*Id.* at 17.)  Of course, Dr. Bender is not the decisionmaker regarding credibility.

[5]  The transcript states that Dr. Brown was testifying to a reasonable degree of medical certainty.  The sentencing hearing transcript, at page 39, reads:

> JUDGE LONG:  You've done no diagnostic work, you've done no clinical work, and you're going to make a judgment to a reasonable degree of medical certainty in this courtroom?
>
> THE WITNESS:  Yes, sir.  I believe I can.  I did see his brain scans, I looked through his medical records after the fact.

However, an incorrect determination of facts is not enough.  Rather, an "unreasonable determination of the facts" is required and is "a substantially higher threshold."  *Schriro*, 550 U.S. at 473 (2007).  Moreover, the state court's ruling did not rely entirely upon its incorrect description of Dr. Brown's testimony.

Annarelli argues that his remembrance of the events when taken before the magistrate a few hours after the incident does not relieve an attorney of the duty to investigate a claim of memory loss several days later, when the memory loss extends from the client's first meeting with the attorney throughout the representation.  Nor does a recorded phone call five days after the offense, in which the defendant remembered portions of the event.  To the contrary, the instances of memory recall cited by the state court suggest that declining further investigation into alleged memory loss was a reasonable strategic decision.  The state court's reasoning, at minimum, presents a reasonable argument that *Strickland*'s deferential standard was satisfied by counsel.

### III.  CONCLUSION

For the reasons stated, the court will grant respondent's motion to dismiss and deny Annarelli's petition.  Further, concluding that Annarelli has failed to make a substantial showing of the denial of a constitutional right as required by 28 U.S.C. §2253(c)(1), a certificate of appealability will be denied.  An appropriate order will be entered.

Entered: March 29, 2021.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge